ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Cascade Designs, Inc. | )   ASBCA No. 62378 |
| | ) |
| Under Contract No. W911QY-17-D-0246 | ) |

APPEARANCE FOR THE APPELLANT:      William A. Shook, Esq.
                                     The Law Offices of William A. Shook PLLC
                                     Seattle, WA

APPEARANCES FOR THE GOVERNMENT:   Scott N. Flesch, Esq.
                                     Army Chief Trial Attorney
                                     Zachary F. Jacobson, Esq.
                                     MAJ Weston E. Borkenhagen, JA
                                     Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE STINSON
ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

Appellant Cascade Designs, Inc. (Cascade), appeals from the default termination of the captioned contract by the Army Contracting Command, Aberdeen Proving Ground, Natick (ACC-APG Natick).  We have jurisdiction pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109.  Both parties submitted motions for summary judgment, responses, reply briefs, and supplements to the Rule 4 file, for consideration in deciding this appeal.  For the reasons stated below, the Board denies the parties' motions for summary judgment.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1.  This appeal involves a Phase III Small Business Innovation Research (SBIR) Contract No. W911QY-17-D-0246 (the "contract"), for individual water treatment devices (IWTDs), awarded to Cascade on September 22, 2017, for a minimum amount of $2,583, and a maximum amount of $6,500,000 (Joint Statement of Undisputed Material Facts (JSUMF) ¶ 1; R4, tab 1 at 2-3).  The award followed completion of Phase I and Phase II SBIR contracts (Contract Nos. W9111QY-10-0062 and W911QT-11-C-0004) to design and manufacture IWTDs, awarded to appellant on January 11, 2010, and January 11, 2011 (JSUMF ¶ 3).  Under these initial contracts, appellant conducted technical feasibility studies and developed prototypes (JSUMF ¶¶ 3-4).

*Testing Protocols*

2.  The contract requires IWTDs pass both First Article Test (FAT) and Lot Acceptance Test (LAT) reviews (JSUMF ¶ 21).  Mandatory testing protocols are set forth

in the contract's Purifier Specific Test Plan (PSTP) (contract Attachment 1) and the Quality Assurance Test and Inspection Plan (QATIP) or Quality Assurance (QA) Test Plan (contract Attachment 2) (JSUMF ¶¶ 22-24, 53; R4, tabs 2- 3).

*PSTP Requirements*

3.  The PSTP sets forth testing protocols for water purification of the IWTDs during both FAT and LAT (JSUMF ¶¶ 23-24).  With regard to the LAT, the PSTP "details the testing of individual water purifiers, including the technology and device design, the challenge water chemical and microbial composition, the exact laboratory procedures planned, and follows [National Science Foundation] NSF Protocol P248, *Military Operations Microbiological Water Purifiers*, Appendix B (2012)" (JSUMF ¶ 27; app. supp. R4, tab C-22 at CDI 000163) (emphasis in original).  NSF P248 was "derived and adapted primarily from publications of the U.S. Environmental Protection Agency (USEPA) and NSF International" (JSUMF ¶ 41).  The QATIP likewise follows NSF P248 (JSUMF ¶ 30).

4.  NSF P248 sets forth microbiological reduction (i.e., kill, remove, or inactivate) requirements for IWTDs, including minimum required reductions for categories of bacteria, virus, and cyst (JUMSF ¶¶ 31-32).  As part of the testing, water is passed through IWTDs to determine whether the purifier reduces to an acceptable degree the concentration of microbiological additions to the water (JSUMF ¶¶ 33-34).

5.  One of the analytical procedures contained in NSF P248 applicable to the LAT is a "Log Reduction Calculation" which is set forth in Section 3.8.3.1, and involves collecting influent and effluent water samples for analysis (JSUMF ¶ 36). [1]  NSF P248 (and the PSTP) set forth a 99.9999 percent, six log reduction for bacteria, and a 99.99 percent, four-log reduction for viruses.  NSF P248 and the PSTP set forth a 99.9%, three-log-reduction for cysts, which are tested during FAT review, but not during the LAT (JSUMF ¶ 35).  Section 3.8.3.1 provides, "[t]esting will be conducted simultaneously on three identical devices, termed replicates.  At each sampling point, influent and effluent water samples will be collected and each analyzed in triplicate." (JSUMF ¶ 36)

6.  PSTP Section 5.6, entitled Acceptable Reduction Deviation, provides that, in accordance with NSF P248, while conducting a LAT the IWTPs "must continuously

---

[1] Log reduction refers to "the relative number of living microbes that are eliminated by disinfection."  Rajul Randive, *What Is Log Reduction*, http://www.klaran.com/what-is-log-reduction (last visited December 8, 2021). "Influent" refers to water flowing into the IWTD and "effluent" refers to water flowing out.  *See* http://www.merriam-webster.com (last visited December 8, 2021).

meet or exceed the log reduction requirements shown in Table 3, except for the following acceptable allowance.  Up to 10% of influent/effluent sample pairs may vary from the reductions required in Table 5 by:  Viruses: 1 log [and] Bacteria: 1 log."  (JSUMF ¶ 40; R4, tab 2 at 16)  The PSTP FAT procedures contain the same 10 percent Acceptable Reduction Deviation for viruses and bacteria (JSUMF ¶ 37).  The 10 percent Acceptable Reduction Deviation also is set forth in the USEPA Guide Standard and Protocol for Testing Microbiological Water Purifiers (1987), which is referenced in NSF P248 (JSUMF ¶ 42).  The parties agree that "[d]uring the LAT, the PSTP requires that the water purifiers continuously meet or exceed the reduction requirements and only permits up to 10% of samples to deviate from the requirement within a range of 1 log for viruses and 1 log for bacteria" (JSUMF ¶ 38).

7.  NSF P248, Section 3.8.3.2, Acceptance of Records, provides that, in accordance with "[s]ection 3.5.3 of the USEPA Guide Standard, three production units (replicates) of the SWP [Small Water Purifier] must continuously meet or exceed the log reduction requirements shown in Table 2-1, except that up to 10% of influent/effluent sample pairs may vary from the reductions required in Table 2-1 by:  Viruses: 1 log; Bacteria: 1 log; Cysts: ½ log" (JSUMF ¶¶ 36, 135).

*QATIP Requirements*

8.  The QATIP sets forth a number of performance requirements for IWTDs applicable to the LAT.  Included within those requirements is paragraph 3.3.2.3, Water Purification, which states "[t]he IWTD must provide microbiological purification equal to or greater than NSF Protocol P248 levels for fresh water sources, when tested as specified in 4.3.2.3," and paragraph 3.3.2.7, Drop Resistance, which states the IWTD "[s]hall be capable of being dropped 4ft (dry) and 6ft (dry inside hydration system carrier) onto concrete surfaces and continue to meet Water Purification and Turbidity Reduction requirements when tested specified [sic] in 4.3.2.7" (JSUMF ¶ 54).

9.  The QATIP requires water purification testing of 13 IWTDs during the LAT, evaluated to NSF P248 standards as required by the PSTP (JSUMF ¶ 61).  The LAT drop resistance test requires three IWTDs be dropped in three separate orientations for a total of nine drops per IWTD (JSUMF ¶ 64).  The LAT Drop Resistance test also requires the three dropped IWTDs undergo the PSTP water purification test (JSUMF ¶ 65).

10.  Pursuant to the contract's Inspection and Acceptance section, in the event a failure occurs during LAT, the contractor is required to conduct a Failure Analysis and Corrective Action Report (FACAR), which is submitted to the contracting officer and the Defense Contract Management Agency (DCMA) within ten working days of the contractor's notification of the failure.  The FACAR sets forth:

the date of failure, design code, lot number and size, detailed failure description, detailed failure analysis, including testing, to identify the root cause for the failure, failure history, corrective action and validation plan to assess the effectiveness of the corrective action, any proposed changes/modification to approved Production Process Package (PPP) submission, and proposed disposition of the failed item and lot, and containment actions.

(JSUMF ¶ 68)

11. With regard to the LAT, the Contract states, "[r]esults of testing, inspections, and examinations will determine the acceptance or rejection of entire production lot," but "[i]f, however, the contractor conducts a root cause analysis and the Government agrees, that the root cause for failing LAT was isolated to a particular component within the system, the remaining components of the system can be rescued and reused for production with other lots" (JSUMF ¶ 71).

12. The contract's 10 percent Acceptable Reduction Deviation set forth in PSTP Section 5.6, appeared in previous PSTP iterations and drafts circulated between the parties as far back as, at least, May 2015 (app. supp. R4, tab 90 at CDI 010032, tab 94 at CDI 010064, tab 98 at CDI 010098, tab 97 at CDI 010110, tab 98 at CDI 010120, tab99 at CDI 010152).

13. The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.249-8, Default (Fixed-Price Supply & Service) (APR 1984) (R4, tab 1 at 29).

*Delivery Order No. 1*

14. On September 22, 2017, the same day as contract award, the government issued Delivery Order No. 1 (Requisition/Purchase Request No. 001 1075002-0002), requiring delivery of 30 IWTDs for FAT and LAT reviews, as well as delivery of an additional 37,951 IWTDs (JSUMF ¶¶ 75-76; R4, tab 4 at 1). Delivery dates were set as follows: FAT report (CLIN 0001), December 8, 2017; 30 IWTDs for testing (CLIN 0002), November 30, 2018; 37,951 IWTDs (CLIN 0003), December 1, 2017; and LAT (Production Lot Testing – CLIN 0004), September 29, 2017 (R4, tab 4 at 2-5).

15. On November 8, 2017, the parties amended Delivery Order No. 1 (Amendment No. 01), setting new delivery dates as follows: CLIN 0001, from December 8, 2017, to February 28, 2018; CLIN 0002, from November 30, 2018, to January 30, 2018; CLIN 0004, from September 29, 2017, to September 24, 2018. The amendment modified the delivery schedule for the initial 37,951 IWTDs - CLIN 0003, decreasing the amount from 37,951 IWTDs to 3,750 IWTDs and changing the delivery

4

date from December 1, 2017, to April 6, 2018. The amendment also added the following delivery requirements for the remaining IWTDs: 6001 IWTDs with a delivery date of September 24, 2018; 6000 IWTDs with a delivery date of August 24, 2018; 6000 IWTDs with a delivery date of July 24, 2018; 6000 IWTDs with a delivery date of June 25, 2018; 5,500 IWTDs with a delivery date of May 29, 2018; and 4,700 IWTDs with a delivery date of May 1, 2018. (JSUMF ¶¶ 77-78; R4, tab 6 at 1-5)

16. In a subsequent contract amendment, the delivery date for CLIN 0001 was changed from February 28, 2018, to March 2, 2018, via Amendment No. 02. The delivery date for CLIN 0002 was changed from February 8, 2018, to February 15, 2019, via Amendment No. 03. The delivery dates for CLIN 0003 likewise were amended. The delivery date for the initial 3,750 IWPDs, set pursuant to Amendment No. 1 as April 6, 2018, was changed to April 30, 2019, via Amendment No. 3, and to May 31, 2019, via Amendment No. 04. The delivery dates for the additional IWPDs also were changed by amendment, and the delivery quantities periodically were decreased or increased as well, although the overall requirement of 37,951 IWTDs did not change. The delivery date for CLIN 0004, was changed from September 24, 2018, to October 31, 2019, via Amendment No. 03. (JSUMF ¶¶ 77-78, 81, 88-89; R4, tab 6 at 1-5, tab 12 at 3-7, tab 22 at 2, 5-6, tab 54 at 3)

*FAT Report and Authorization to Commence Production*

17. On April 19, 2018, the government accepted Cascade's FAT report (CLIN 0001) and the 30 IWTDs that comprised the first article items (CLIN 0002) (JSUMF ¶ 79). The government also granted Cascade "[a]uthorization to commence with full rate production on CLIN 0003" (app. supp. R4, tab C-31).

*Issues Arise Regarding LAT 2 and Required LAT Procedures*

18. On May 29, 2018, Paul Smith, Principal Engineer for Cascade and Mountain Safety Research (MSR) (app. supp. R4, tab 134 at CDI 010357), emailed Dr. Cindy Vindman, Project Officer, PM SCIE (Soldier Clothing and Individual Equipment), Durable Goods Team (app. supp. R4, tab 151 at CDI 010442; JSUMF ¶ 2), and Ronda Stapps, Quality Assurance, Durable Goods (app. supp. R4, tab 101 at CDI 010161), to inform them about issues regarding LAT 2 and interpretation of certain test requirements (app. supp. R4, tab 101). Mr. Smith stated that "[a]ll purifiers in LAT passed efficacy per PSTP," that "[t]wo purifiers failed the Safety Test at 0% and passed the Safety test at 100% but passed the micro test at both," that "[a] different purifier failed the Safety Test at 100% and passed it at 0% but passed the micro test at both," and that these constituted "a false negative result" (*id*. at CDI 010159). Mr. Smith informed the government that shipment of Lot No. 2 was on hold, and that completion of the LAT for Lot No. 3 also was on hold, because of questions regarding proper testing procedures (*id*.).

5

19.  Ms. Stapps responded by email dated May 30, 2018, stating, "I am putting together a contractual mod to set in stone testing procedures," and asking for clarification of Cascade's LAT procedures, including whether the 13 IWTDs designated for a safety test would be sent to IEH-BioVir Laboratories (BioVir), an independent testing lab (app. supp. R4, tab 103 at CDI 010166).

20.  Mr. Smith responded to Ms. Stapp by email dated May 30, 2018, confirming that 13 IWTDs would be sent to BioVir for testing, but reserving Cascade's right to send only three IWTDs for independent testing, as opposed to all 13, as specified in the contract (app. supp. R4, tab 103 at CDI 010164).

*Issue Regarding Number of IWTDs to be Tested*

21.  In June 2018, a dispute arose regarding whether the three IWTDs selected for drop resistance testing could be selected from the 13 IWTCs designated for water purification testing (R4, tabs 14-15).  In an email dated June 15, 2018 (11:40 am), Mr. Smith asserted "we saw and see nothing that says the drop tested filters can't be part of the 13.  We let DCMA select which three out of the 13 he has already selected for the Water Purification test that he would like to see drop tested.  They are dropped here . . . [and] then tested along with the rest of the 13."  (R4, tab 14 at 2-3)

22.  Ms. Stapps responded by email dated June 15, 2018 (2:44 pm), stating that the contract contains separate testing requirements for water purification (Section 4.3.2.3), which describes the selection of 13 IWTDs (with the testing of three at a government-approved lab), and drop resistance (Section 4.3.2.7), which describes the testing of three IWTDs and "is its own testing requirement."  Ms. Stapps stated also that testing is never combined, so as "to keep testing data results pure to the requirements in which we are testing," noting that "so much weight is put on the water purification testing, we never want to muddy the testing results."  (R4, tab 14 at 1)

23.  By email dated June 15, 2018 (3:26 pm), Mr. Smith responded to Ms. Stapps, stating that the risk "a drop test failure gets confused with a microbiological failure is a risk we chose to take," stating that "the root cause analysis will include analysis of the affected filter plus much more extensive testing of the affected fiber lots and / or manufacturing batch," and that appellant fully understood that this "may muddy the waters and that a failure will therefore result in a more extensive root cause analysis and potentially a larger consequence."  (R4, tab 15 at 2-3)

24.  By email dated June 15, 2018 (5:14 pm), Ms. Stapps stated, "future drop tests will be a separate 3 items.  You can run the testing inhouse [sic] or you can send them out to a Government approved P248 lab.  Your choice.  They are not to be co-mingled with the 13 random end items pulled for water purification testing."  (R4, tab 15 at 1-2)

*Issue Regarding the 10 Percent Acceptable Reduction Deviation*

25. By email dated June 20, 2018, Arthur Lundquist, Army Public Health Center, Field Water Branch, provided Ms. Stapps information he received from Nikki Beetsch, an employee of NSF, who confirmed that the 10 percent influent/effluent sample pair referenced in the Acceptable Reduction Deviation was the influent/effluent per device, such that for six samples, using three units or triplicates, there would be 18 sample pairs, and the 10 percent tolerance "would allow one of the pairs to not meet the log reduction requirement" (app. supp. R4, tab 111 at CDI 010218-19).

26. The parties held a teleconference on June 22, 2018, to discuss LAT protocol. Mr. Smith's notes of that meeting, under the heading "Two test failures identified," stated "[o]ur understanding is that the P-248 Protocol accommodates the potential variance in the microbiological testing methods by allowing a tolerance in the test," that "BioVir, one of the three labs certified by the government to perform the P248 test, listed this test as a pass," but that the government "considers this to be an absolute fail," and would "be removing the 'Testing Tolerance' from the contract effective now," claiming that it "should never have been in" the contract (app. supp. R4, tab 112 at CDI 010221).

27. According to Mr. Smith's notes, as of June 22, 2018, Cascade had completed LAT 2. Cascade was awaiting the test report from BioVir for LAT 3, as well as a decision from the government whether it must submit three additional IWTDs for drop resistance testing. The IWTDs for LAT 4 were manufactured, but DCMA had not yet selected sample IWTDs for testing. Third-party testing was scheduled to begin July 5, 2018, on LAT 5, with the LAT 5 report to be submitted on July 18, 2018, and shipment of the first 6,000 IWTDs to occur on July 25, 2018. (App. supp. R4, tab 112 at 010224)

*Additional IWTD Orders*

28. On July 30, 2018, the government issued a new Delivery Order No. W911QY18F0490 (Requisition/Purchase Request No. 001 1213756-0002) (R4, tab 16), adding to CLIN 0003: 5,500 IWTDs with a delivery date of December 31, 2018; 5,500 IWTDs with a delivery date of January 31, 2019; and 375 IWTDs with a delivery date of February 28, 2019 (JSUMF ¶ 83; R4, tab 16 at 4). Bilateral Modification No. P0001 dated February 1, 2019, changed the delivery dates for Delivery Order No. W911QY18F0490, as follows: 5,500 IWTDs from December 31, 2018, to November 29, 2019; 5,500 IWTDs from January 31, 2019, to December 31, 2019; and 375 IWTDs from February 28, 2019, to December 31, 2019 (JSUMF ¶ 90, R4, tab 23).

*Government Recommendation to Remove 10 Percent Acceptable Reduction Deviation*

29.  In preparation for an August 30, 2018 meeting, by email dated August 15, 2018, Dr. Vindman submitted to Ms. Stapps and other government officials, a summary of IWTD issues.  Dr. Vindman proposed "removal of the 10% allowance from the LAT PTSP [sic] (Section 5.6)," stating, "I feel that it was errantly included and is not relevant considering the reduced number of sampling points per device performed during LAT." Under the heading "Microbiology Lot 2," Dr. Vindman noted there were two failures of the devices and that, although there is a 10 percent allowance for failures of influent/effluent pairs, the "reduced P248 protocol allowed for by LAT PSTP only calls for 2 sample points per device with three challenge organism, yielding 6 total sampling points per device," and, as such, "there cannot be a 10% allowance per device as there is in a full P248 because 10% of 6 is less than 1."  Dr. Vindman suggested "a retest of devices from the sublots identified," noting that the Contract "calls for retesting from the same sub-lot as the failures," and that "[t]his portion of the contract was artfully drafted to allow the segregation of fewer potential errant devices allowing for the acceptance of the remainder of the sublots unaffected by the original failure."  (App. supp. R4, tab 120 at CDI 010278-79)

*Importance to Cascade of 10 Percent Acceptable Reduction Deviation*

30.  By letter dated August 17, 2018, to Dr. Vindman, Tim Oriard, Principal Scientist for Cascade, addressed "the variance in interpretations of the '10% rule' in the microbiological testing of the Patrol filters," stating that the 10 percent rule was "written into the contract and agreed upon by both parties at the time," and "was one of the factors upon which we based our cost calculations."  Mr. Oriard noted that "[t]he 10% rule is an important part of all the major microbiological testing standards," that the purpose of the rule "is to mitigate the risks of false failures that can occur because of the accuracy (or inherent inaccuracy) of the microbiological sample enumeration methods used," and that this is accomplished "by allowing 10% of sample pairs to be out of spec by up to 1 log for bacteria and virus and 0.5 log for cysts."  (App. supp. R4, tab 121 at CDI 010281-82)

*Internal Government Emails Discussing 10 Percent Acceptable Reduction Deviation*

31.  The government held an internal telephone conference on August 21, 2018, to discuss contract issues, and an upcoming meeting with Contracting Officer, Matt Buchanan.  In preparation for the teleconference, Ms. Stapps sent an email dated August 21, 2018 (7:27 am), to CPT Wai W. Ellison, Assistant Product Manager, Durable Goods Soldier Clothing and Individual Equipment, PEO Soldier, with copies to

8

Dr. Vindman and Ian Johnson[2] (app. supp. R4, tab 122 at CDI 010284-287. Ms. Stapps stated, "I have not finished contract language yet. I have been waiting for discussions to finish out wrt[3] NSF, Cindy, and Art. . . . I have already removed the 10% language since that decision was made after my trip to Cascade a month ago." (*Id*. at CDI 010287)

32. By email dated August 21, 2018 (10:16 am), CPT Ellison recounted a conversation between Mr. Lundquist, Dr. Vindman, and Jeffrey Dunn[4] regarding the Acceptable Reduction Deviation (app. supp. R4, tab 122 at CDI 010286). CPT Ellison's email states:

> Art: during a conversation with Cindy: aware of Jeff's intent when the PSTP was written [- ] in APHC opinion this allowance does not endanger the safety of Soldiers. Do want to see an explanation. [5]
>
> Jeff: said current wording was exactly his intent when he was [sic] wrote it as the primary engineer
>
> Cindy: 10% reduction is meant to be considered per challenge organism
>
> Ellison: removing 10% rule (performance) will greatly affect the cost, probably not be a simple mod, vendor may not agree without getting more money. Art (Army Health command) should be the authority on the standard.

(App. supp. R4, tab 122 at CDI 010286)

33. By email dated August 21, 2018 (10:23 am), Ms. Stapps responded to CPT Ellison's email with the following question: "CPT E – Jeff Dunn's response for 10%.. [sic] he said that about LAT?" (app. supp. R4, tab 122 at CDI 010285). By email dated August 21, 2018 (10:39 am), Dr. Vindman responded, stating "Ronda, Yes Jeff says the 10% rule was left in the PSTP intentionally. I just called him again to confirm

---

[2] Mr. Johnson was an employee of NCI Information Systems, Inc., and associated with PM SCIE, Durable Goods, as acquisition support (app. supp. R4, tab 130 at CDI 010321).

[3] Presumably "wrt" is a reference to "with regard to."

[4] In 2015, Mr. Dunn was Lead Product Engineer, U.S. Army Product Manager, SCIE, and, in 2017, was involved in developing the LAT PSTP (app. supp. R4, tab 90 at CDI 010028, tab 143 at CDI 010389-390).

[5] APHC is a reference to the U.S. Army Public Health Command (USAPHC) (app. supp. R4, tab 148 at CDI 010405).

9

our recently [sic] conversation on that." *(Id.)*. By email dated August 21, 2018 (12:03 pm), Ms. Stapps responded "Really?  For the LAT?  I get it for FAT." (*Id.*)

34.  By email dated August 21, 2018 (12:02:35 pm), Dr. Vindman summarized her August 21, 2018, telephone conference with Ms. Stapps and Mr. Johnson.  Regarding the 10 percent Acceptable Reduction Deviation, Dr. Vindman stated:

> Ronda's take: This needs to be completely removed from LAT PSTP. For the following reasons
>
> 1. This language was taken and references P248 protocol section 3.8.3.2. This portion of NSF P248 specifically states that:  3.8.3.2 Acceptance of Records. IAW Section 3.5.3 of the USEPA Guide Standard, three production units (replicates) of the SWP must continuously meet or exceed the log reduction requirements shown in Table 2-1, except that up to 10% of influent/effluent sample pairs may vary from the reductions required in Table 2-1 by:
>
> The important part of this is that " 3 SWP must continuously meet". [sic]  In full P248 3 devices are being challenged at 6 different points (7 if you include stagnation). In our reduced testing we are only sampling at 2 points. We made this allowance to reduce the cost of testing. We are also allowing a very small sample number (13) which represents thousands of units per lot. The original P248 10% allowance of noted above is not applicable given the reduction in tested already allowed for due to cost. Specifically the original full P248 per 3 devices was a cost of $2100. The current reduced testing called for by LAT costs $9000.

(App. supp. R4, tab 122 at CDI 010284)

35.  During the August 21st telephone conference, Dr. Vindman took the position "that the 10% rule is problematic and that it is very different in context of the reduced P248 testing called for," and that she "supports asking the KO for complete removal." Dr. Vindman stated that "[i]f complete removal will cause a significant price increase in the IWTD we will have to consider a course of action at that time."  Dr. Vindman stated also that "[i]n the call with Matt Buchanan we would like to discuss removal the 10% language and removal of the language from the QATIP.  We would like to make a decision after the call with Matt Buchanan on how to move forward so that any necessary language changes can be executed by Ronda Stapps prior to August 30th meeting." (*Id.*)

10

36. By email dated August 21, 2018 (3:18 pm), Dr. Vindman stated, "I agree with Ronda that we should propose removal of the 10% rule from LAT testing[,] sit down with Jeff Myer and discuss what would be acceptable as an increase in the price of IWTD units if we want to remove this language" (app. supp. R4, tab 124 at CDI 010290-91). By email dated August 22, 2018, Ms. Stapps responded to Dr. Vindman's email stating, "the 10% allows a possibility of 2 failures per lot test, 1 per each organism. I feel it is just too much risk to accept given all the 'allowances' we have made" (app. supp. R4, tab 124 at CDI 010290).

37. By email dated August 21, 2018 (5:06 pm), to Ms. Stapps and Dr. Vindman, Mr. Johnson stated, "I'm writing the draft email for Matt. I know we've made concessions to MSR to reduce testing costs. Beside reducing the test sample size, what were the other concessions we provided to reduce costs to MSR which will help make our case for removal of the 10% requirement?" (App. supp. R4, tab 100 at CDI 010157)

38. Dr. Vindman responded by email dated August 21, 2018 (6:38:46 pm), stating that there were two contractual changes "put in place to reduce the testing burden on MSR," and "[t]o reduce the cost of testing and therefore the cost of the IWTD." Specifically, the government "reduced testing protocol that only requires 2 assay points per organism per device," and "[t]o reduce the risk of lot failure[,] the contract allows for specific sublots to be the subject of failure in the event that any devices fail microbiological challenge." (App. supp. R4, tab 100 at CDI 010157)

*Contracting Officer Requests Cascade Agree to Removal of 10 Percent Acceptable Reduction Deviation from Contract*

39. In an August 23, 2018, email to Tim Davis, Director, Government Sales, Cascade, the contracting officer stated:

> During the 22 June teleconference between the Government and MSR, we discussed LAT results which identified two units that failed testing, device J 0% E.coli and device L 0%MS2. Based on these test results, MSR agreed to retest 13 items from the corresponding sub-lot to ensure there were no issues from Lot #2. Two months passed before MSR advised the Government the sub-lot would not be retested. MSR expressed concerns regarding the protocols and acceptance criteria, as well as the costs to retest. The Government is concerned with the delayed MSR response and its unwillingness to stand behind the quality of its products and immediately retest the sub-lot. The Government requests MSR reconsider retesting items as discussed 22 June.

11

Prior to contract award, the Government agreed to provide MSR with several concessions in an effort to reduce the costs and risks for MSR on LAT testing. 1. Reduced P248 testing per lot by requiring only 2 assay points per organism per device. 2. Reducing risk of lot failure by allowing specific sub-lots to be the subject of failure in the event that any devices fail microbiological challenge, instead of an entire lot. The reduced P248 protocol only calls for 2 sample points per device with three challenge organism, yielding 6 total sampling points per device. Therefore there cannot be a 10% allowance per device, as the case is with the full P248, because 10% of 6 is less than 1.

The Government requests removal of the 10% allowance from the LAT PTSP [sic] (Section 5.6). The Government will also submit a revised QATIP for MSR's review which will include verbiage to ensure the devices were not sullied in any ways prior to shipment to a 3rd party lab.

(App. supp. R4, tab 126 at CDI 010294-295)

40.  The parties held a meeting on August 30, 2018, addressing a number of topics, including "P-248 Test protocols discussions."  According to notes of that meeting, (prepared by Mr. Johnson (app. supp. R4, tab 130 at 010321)) SCIE decided to remove the 10 percent Acceptable Reduction Deviation and needed to know implications of this decision.  The government stated it would provide proposed changes to the contract language regarding how to treat filters that test below four log limits.  According to the meeting notes, appellant agreed, in principle, "that the future procedure would be to resubmit for LAT testing any sub lots that had low testing filters," that "[a]ll sub lots that initially passed the LAT would be accepted and any retested sub lots that passed would also be accepted, and "that there may be additional cost associated with this contract change and Cascade Designs will evaluate."  The meeting notes also indicate that production of IWTDs for LAT 5 had ceased, and that Cascade had produced approximately 23,000 IWTDs to date.  (App. supp. R4, tab 129 at 010302-03)  By email dated August 31, 2018, Doug Sanders, Vice President, MSR, summarized his understanding of the LAT test protocol discussion, which appear to be in agreement with Mr. Johnson's notes of that meeting (app. supp. R4, tab 130 at CDI 010325-26).

*Cascade Waiting to Receive Revised LAT Protocol Language from Government*

41.  By email dated September 5, 2018, to Mr. Smith, Mr. Oriard stated the government

already knows we will not be resubmitting LAT 2 samples to
BioVir until after we have run them all through our new
sorting method ... and they agreed. They also agreed we
would not send anything else out until we got the new
wording of acceptance criteria worked out in the contract.
They are working on that to submit it to us for our approval.

(App. supp. R4, tab 131 at CDI 010328)

*Government Notification of Lot No. 1 Nonconforming Supplies*

42. On October 26, 2018, the contracting officer provided formal notification that
IWTDs associated with Lot No. 1 had "a deficiency in the weld joint area" and were
"nonconforming supplies in accordance with (IAW) FAR 52.246-2" (JSUMF ¶¶ 84-86;
R4, tab 19). The contracting officer required Cascade to submit "a plan of correction for
the nonconforming supplies," and "provide sufficient evidence of a solution to this issue
by 16 November 2018" (R4, tab 19).

43. By letter dated October 29, 2018, Cascade responded to the government's
notice of deficiency, stating that appellant had identified the root cause of the deficiency
and had "a path forward to correct the flawed welding process" (R4, tab 20). Cascade
stated also "[w]hile we are in full agreement that some of the IWTDs manufactured to
date are non-conforming as defined under FAR 52.246-2, we do not agree that all items
are non-conforming. Our analysis leads us to believe that the problem does not affect all
IWTD's manufactured to date." (*Id.*)

*Cascade Submits FACARs to the Government*

44. On February 6, 2019, Cascade submitted four FACARs to the government
addressing three Safety Test/Device Integrity Test failures identified in the manufacturing
of the purifier and a fourth failure identified in the performance of an internal valve in the
pump bulb (JSUMF ¶¶ 91-92). Cascade took corrective action where necessary as to all
four failures detailed in the FACARs, and corrected or resolved the issues identified
(JSUMF ¶¶ 93-96). However, the government rejected all IWTDs manufactured between
start of production in February 2018, through May 24, 2018 (JSUMF ¶ 98).

45. On March 5, 2019, Cascade provided the government a fifth FACAR
concerning the Freeze Resistance Test (JSUMF ¶ 105). Cascade identified lab technician
error as the source of the failure (JSUMF ¶ 108). Cascade verified its findings and
passed three additional freeze resistance and water purification tests (JSUMF ¶ 111). On
March 11, 2019, an independent lab submitted the FAT results, concluding "[w]ith two
exceptions, the tested individual water treatment devices met the item acceptability

requirement of >4-log reduction of virus and >6-log reduction of bacteria" (JSUMF ¶ 112).

*Disagreement About Interpretation and Removal of 10 Percent Acceptable Reduction Deviation*

46. By letter dated March 15, 2019, Mr. Sanders provided the government with "an analysis of Biovir's [sic] microbiological test results from all of this past year, including the most recent FAT test results, in an effort to understand the variability in the testing accuracy." In his cover letter, Mr. Sanders stated that Cascade "is increasingly concerned about the ability of any filter technology to meet the proposed modification to the standards used during the development process and now contained in the contract," and that Cascade's literature search regarding the accuracy of microbiologic testing confirms "that measurement uncertainty is a known factor that must be compensated for in the acceptance criteria." Mr. Sanders provided with his letter references to five "reputable sources confirm[ing] that measurement uncertainty is a known factor that must be compensated for in the acceptance criteria." Mr. Sanders noted that prior to issuance of the contract, Cascade reviewed drafts of the LAT documentation, that Cascade "received what were to be the final copies of these two documents from Jeffrey Dunn," which included the Acceptable Reduction Deviation, and that the contract signed by all parties included the Acceptable Reduction Deviation. Mr. Sanders concluded that "[b]ased on the newest understanding of the test protocol variation, the history of the deviation criteria and its derivation, Cascade Designs proposes to proceed with the production of the IWTD filter with the existing contract language in place." (R4, tab 39 at 2-4; app. supp. R4, tab C-2 at CDI 000002-04)

47. By letter dated March 18, 2019, Dr. Vindman responded to Mr. Sanders's March 15, 2019, letter, noting that the "limited microbial challenge does not provide enough sample points to allow for a loss of 10%," and that previously, "during a meeting with representatives from Natick contracting, PM SCIE and MSR, all parties agreed that the 10% allowance was inappropriate for the LAT PSTP protocol and that it would be removed." Dr. Vindman stated that the government intends "to proceed with the previously agreed upon contractual modification to remove the 10% allowance from LAT PSTP," and proposed "that for any LAT PSTP protocol failure that occurs with an influent value less than one log over the required reduction, an immediate full P248 test be performed on the same fiber batch and results submitted for Government review." (App. supp. R4, tab C-3 at CDI 000006)

48. By email dated March 23, 2019, Mr. Sanders responded to Dr. Vindman's proposal that a full NSF P248 test be performed when certain failures occur. Mr. Sanders stated that the goal of the Acceptable Reduction Deviation "is to gather multiple data points on individual filters so that it can be determined if a low initial result is due to a problem with the fiber batch, or if the result was due to variation in the influent or some

14

unknown lab contamination." Mr. Sanders noted that "[t]he full P248 test is a 2-week long test that not only samples the filters multiple times, but also includes a capacity challenge," and that "[s]ince the goal of this retest is to check the efficacy of the filters, not the capacity," Cascade proposed "to perform a focused P248 test, utilizing the same or more samples per filter, that removes the capacity test and retests only the failed organism or organisms from the LAT test" in order to "reduce the time required to conduct the test, as well as the cost, and still yield the same extra data that can be reviewed to determine acceptability of the fiber batch." Mr. Sanders proposed also that "[a]ny fiber batch with low initial test results would be subject to the secondary test." (R4, tab 41 at 2)

49. By email dated March 25, 2019, Mr. Sanders responded to additional questions posed by Dr. Vindman regarding Cascade's proposed modifications to the NSF P248 test requirements (R4, tab 42 at 1). By email dated April 3, 2019, CPT Ellison thanked Mr. Sanders for his communication regarding IWTD testing protocols, and stated that "[t]he government will seek only minimal contractual changes. We will leave the current LAT PSTP in place without modification to the 10% allowance at this time" (R4, tab 47 at 1).

50. Mr. Sanders responded to CPT Ellison's email, thanking her "for the good news," and stating that "[g]iven all the conversations we have had over this clause in the LAT PSTP it would be in the best interest of all involved to clarify in the contract exactly how this will be interpreted." Mr. Sanders proposed "that section 5.6 be updated with additional wording similar to that used in section 3.5.3 of the USEPA Guide standard from which the 10% rule is derived," calculating the 10 percent influent/effluent sample pairs as follows:

> - Unit: Individual Filter
> - Number of sample pairs over the completed test program:
> 2 per unit * 16 units = 32 sample pairs
> - Number of allowable sample pairs where log reduction is insufficient: 10% of 32 = 3 sample pairs
> - Allowable limits: Bacteria - 5 log, Viruses - 3 log, Microspheres - 2.5 Log
> - Conclusion: If the geometric mean of all reductions meets or exceeds the requirements of table 4, the indicated insufficient samples pairs will be allowed.

(R4, tab 47 at 1)

51. By email dated April 4, 2019, Richard Rivera, Contract Specialist, Army Contracting Command, informed Mr. Sanders, "[t]he Government has carefully reviewed your proposals, reason for delayed response, and have determined to not accept them.

15

We do appreciate your input but do not concur with what was proposed." (R4, tab 50 at 1). By email dated April 5, 2019, Mr. Sanders responded to Mr. Rivera's email, requesting "that the government propose language to be incorporated into the contract that clarifies how the rule is intended to be interpreted," since the government did not accept the wording of Cascade's proposed update to Section 5.6 (*id.*).

*FAT Approval and Delivery Order Modifications*

52. By email dated April 5, 2019, Mr. Rivera provided Mr. Sanders with a copy of the IWTD FAT Approval Record, and informed him that Amendment No. 4, with an updated delivery schedule, would be sent for contractor review and signature (R4, tab 49). By email dated April 8, 2019, Mr. Rivera provided Mr. Davis with a courtesy copy of Amendment No. 04 to Delivery Order No. 1 for signature, as well as a copy of attachments to the contract as Modification No. P00001 (R4, tab 51 at 3).[6] Mr. Davis responded to Mr. Rivera's email, stating he could not sign the documents relating to the base contract until clarifications were made, including the addition of "clarifying language on how the 10% rule is to be applied," and clarification of specific contract sections (R4, tab 51 at 2). Mr. Davis closed his email stating, "[u]ntil we get 5.6 and ee.i updated we won't know if there are any costs changes or potential schedule impacts that come from the final wording[.] We are reviewing the additional documents you sent, and will have further commentary on them later." (*Id.*)

*Additional Discussions Regarding Ten Percent Acceptable Reduction Deviation*

53. By email dated April 9, 2019, Mr. Rivera responded to Mr. Davis, stating that "negotiations for the base contract wording is not going well on both sides," and that "[t]he Government has declined to the proposed changes and have made their final decision on the current negotiations." Mr. Rivera informed Mr. Davis that the contract "will stand as its original form and no modifications that have been in negotiations or proposed will proceed at this time." (R4, tab 51 at 1)

54. By email dated April 11, 2019, with a subject "10% email," to an unknown individual, Ms. Stapps stated:

> During the course of this contract the Government has stated several times, the 10% rule, as it pertains to LAT testing, was a cut and paste error and should not be in the LAT PSTP. It was agreed to during the Aug 2018 meeting to remove the language and we would do an all inclusive mod once the failure analysis had been finalized; to make sure

---

[6] It appears Mr. Rivera's email contains a typographic error - referencing W911QY-17-D-0026 - rather than the correct Contract No. W911QY-17-D-0246 (JSUMF ¶ 1).

16

there were no other items which may need to be included. This was the state of business until the recent FAT failure, when MSR felt it necessary to back out of the agreement of removing the 10% language, to be able to throw out a sample pair.

. . . .

The P248 language as written in the base contract has not changed from what had been used in R/D efforts. The LAT PSTP is an ARMY only protocol, it is derived from the NSF P248 protocol, for testing financial reasons. The suggestion had come from MSR for the Army to review and the LAT PSTP protocol was established to help reduce the cost of testing while still trying to maintain the data we need to make a pass or fail testing decision, for use in a production contract. These discussions were held late 2016 to 2017, well after technology R/D efforts.

In writing the testing protocol documents for contractual purposes, a simple cut and paste error had taken place. Due to the nature of the error, it is beyond the Government's scope to define or clarify, that which was never intended to be part of the abbreviated protocol. We offered a generous change to the protocol with reference to the influent value and MSR did not find it acceptable, so we will revert to the original contract. This time and effort of this contract is well beyond the point of negotiating testing protocol.

(App. supp. R4, tab 180a at CDI 010641a – 641b)

55. By email dated April 12, 2019, to Mr. Davis, Mr. Rivera stated "I wish I knew more about the technical aspect of the IWTD which would give me more insights in what is actually going back and forth but I am optimistic that we will all reach a compromise where everyone feels good" (app. supp. R4, tab 181). By email to Mr. Davis dated April 18, 2019, Mr. Rivera stated, "[w]hen I got the information about the 10% Language, I felt that giving you a courtesy call was the best option. I had a feeling you wouldn't be too happy about it and can understand." Mr. Rivera stated also that "the Government stands with '10% is 10%' as their explanation of the rule," but he also requested that Mr. Davis" provide some feedback, questions or maybe some examples on how you interpret 10% within that example." (R4, tab 186; *see* app. supp. R4, tab C-6 at CDI 000020)

17

56. Mr. Sanders responded to Mr. Rivera's April 18th email, stating:

> The clarification we were seeking, and for which we must have a common understanding is how and on what base is the 10% calculated, or "10% is 10% of what? The contract very clearly defines what this means, but we want to make sure that the government acknowledges that and will apply the contract as written as I will explain below.
>
> The LAT test protocol requires 16 filters. Section 4.3.2.3 of QATIP-IWTD-REV2 specifies 13 filters and section 4.3.2.7 adds an additional 3 filters, all of which "shall be evaluated for microbiological purification as described in the attached IWTD LAT PSTP". During the LAT, each filter is tested with 2 influent/effluent sample pairs. This creates a total of 32 sample pairs (16 filters x 2 sample pairs per filter). The contract wording in Section 5.6 of Attachment 0001 – Purifier Specific Test Plan, NSF Protocol P248, Appendix B reads: "Up to 10% of influent/effluent sample pairs may vary from the reductions required in Table 5 by:
>
> Viruses: 1 log
> Bacteria: 1 log"
>
> So since we are testing/evaluating 32 sample pairs, it is clear that the contract states that the 10% means that up to 3 influent / effluent samples pairs (10% of 32) may have a low observed log reduction during the LAT test. We ask that the government agree to apply section 5.6 of the contract as written.

(App. supp. R4, tab 188)

57. By email dated April 19, 2019, to CPT Ellison, Ms. Stapps stated:

> Not sure why you didn't want to send my prior response. This is why I wrote it with specifics- they will continue efforts to redefine testing until told NO. 10% is NOT 10% when it comes to LAT. LAT Section 5.6 refers to section 3.8.3.2 of NSF P248 which states the conditions which the 10% will be applied, which are "three production units (replicates)" when tested according to the NSF P248 standard: 6 sample points in triplicate for each of the 3 IWTD, that is 54 data points per

18

replicate (fiber batch).  As Doug states there are only 2 sample points taken in the ARMY abbreviated P248 LAT giving us 26 COMBINED (not per fiber batch) data points from the 13 and 6 COMBINED from the drop test. This does NOT meet the conditions to apply the 10% deviation rule. AGAIN, we will not define a cut and paste error. If ANY sample fails during LAT, they need to provide a FACAR for further evaluation. 10 % ONLY applies to a Full P248 test.

If they want to perform a full P248 per each fiber batch, we have already said we would be willing to look at the increased cost. Outside of that, we cannot and should not be providing happy to glad answers to appease them. They will take advantage of it, I promise you they will. We need to provide Government risk mitigation for the Soldiers. If something fails during testing (with the small sampling size we use) we should find out why and not look to throw out any data.

You can have Richard send something back like:

As stated, and agreed to previously, the 10% deviation as applied to Army abbreviated P248 LAT protocol is a cut and paste error. The Government cannot define it specific to Army abbreviated P248 LAT protocol as the testing parameters are significantly different than the NSF P248, where the deviation rule is defined. Upon any Army abbreviated P248 LAT failure, a FACAR will need to be submitted to the Government for review.

(App. supp. R4, tab 185 at CDI 010652)

58.  On April 29, 2019, Mr. Rivera provided Mr. Davis an email with a subject line "10% Language is Here."  In that email, Mr. Rivera stated that he "finished reading the whole 10% Language thing and put it in a word document," and that "[i]t looks like this 10% Language thing goes back to August of 2018."  Mr. Rivera stated also "I am in hopes that this explanation is good and we can go ahead and move forward," and, "[i]f this language is understood, we can go ahead and work on the delivery schedule passed May 31." (R4, tab 55 at 1)  The explanation provided by Mr. Rivera in the word document, was a restatement of information provided by Ms. Stapps in her April 11, 2019, email.  Mr. Rivera, like Ms. Stapps, stated, in part:

In writing the testing protocol documents for contractual purposes, a simple cut and paste error had taken place. Due to

19

the nature of the error, it is beyond the Government's scope to define or clarify, that which was never intended to be part of the abbreviated protocol. We offered a generous change to the protocol with reference to the influent value and MSR did not find it acceptable, so we will revert to the original contract. This time and effort of this contract is well beyond the point of negotiating testing protocol.

(R4, tab 55 at 2-3)

*Internal Cascade Emails Questioning the Government's "Cut and Paste" Statement*

59. By email dated April 29, 2019, addressed internally to Cascade, Mr. Smith discussed Mr. Rivera's "10% Language is Here," email, stating:

> I think this document states very clearly that no protection from lab error or test variation will be granted by this team.
>
> No cut & paste error of such magnitude would have survived the documented 4 month long back & forth review of this document. It's not like the 10% rule just appeared in the final version of the contract.
>
> Where do we go from here? Since there is no contract change (simply a difference of interpretation) I assume we cannot raise the price?

(App. supp. R4, tab 191 at CDI 010662)

60. By email also dated April 29, 2019, Mr. Davis provided additional comments to Mr. Sanders and other Cascade employees regarding Mr. Rivera's "10% Language is Here" email, stating that Cascade "should also dispute the statement 'It looks like this 10% Language thing goes back to August of 2018.'" Mr. Davis added, "I think it goes back to the SBIR work and has much more history, and validity than that." (App. supp. R4, tab 190)

*Internal Government Email Regarding Cascade*

61. By email to Mr. Rivera dated May 21, 2019, Ms. Stapps discussed "Patrol IWTD Sample Selection and Conformance visit Results," stating:

> Angel [Ramos, Jr., Quality Assurance Representative, DCMA] wanted to give us a head's up, to know that he could

20

not accurately assess the full health of quality - given the epic failure of the entirety of last year's production. He is keeping his thumb on them and is in constant communication with me.

I called in to the 2nd FAT documentation meeting last month, and I can tell you, MSR was being VERY confrontational concerning required documentation. Their insatiable need for argument is evident in the email to you from Tim where he says, the 10% rule discussion is not over. They need to conduct business. Negotiations are over. If they have questions concerning the contract we will answer them, NOT argue about them. We have tried to help and all they want to do is argue or negotiate to lower requirements. Even their kiss butt emails have an air of smugness to them. Ugh. It is tiresome. Anyhow...

(R4, tab 58)

*Submission of LAT 5 Report*

62. On May 21, 2019, Cascade submitted to the government a copy of the May 17, 2019, LAT results for Lot No. 5, indicating that it passed the PSTP (R4, tab 57 at 4, 9).

63. By letter dated June 7, 2019, the contracting officer informed Cascade that the government had reviewed the May 17, 2019, LAT 5 report, stating that "the items presented for testing failed LAT requirements," and the government would not accept the lot of IWTDs. The government's rejected the lot because "Test item F, serial number A31720, failed to meet the required post drop 4 log reduction of bacteriophage MS-2." The contracting officer stated that "[t]he drop resistance testing can be found in section 4.3.2.7 of the Quality Assurance Test and Inspection Plan (QATIP) for the Individual Water Treatment Device (IWTD)." (App. supp. R4, tab C-10 at CDI 000078)

64. By email dated June 7, 2019, Mr. Davis responded to the government's rejection of the LAT 5 report, noting that section 4.3.2.7 "only describes the process for dropping," and does not contain log reduction criteria, providing instead that testing will be conducted "'as described in the attached IWTD LAT PSTP.'" Mr. Davis stated that "[t]he passing criteria is covered under section 5.6 and the claim that an individual filter failed to meet a log reduction criteria continues to show that you are misinterpreting the contract." Mr. Davis stated also that "[t]here is no requirement that any individual filter meets 4 log reduction," and that only "90% of the sample pairs of all the tests during LAT must meet that reduction, which they did." (App. supp. R4, tab C-11)

21

65. By email dated July 3, 2019, Mr. Rivera provided Mr. Davis the position of the Program Office, stating that "[t]he drop challenge assesses the post drop ability of an IWTD to microbiological purification 'as described in the attached IWTD LAT PSTP,'" that "[t]he 13 items tested new are assessed for their ability as unstressed items to perform microbiological clearance as described in the IWTD LAT PSTP," that "[t]hese two data sets represent 2 completely separate assessments both based on the ability to meet LAT PSTP log reduction requirements," and that "[t]hey are not equivalent data sets and cannot be considered a continuous body for the purposes of a 10% failure allowance." Mr. Rivera stated also that "the test was interpreted by you guys as adding all the apples and oranges and it's supposed to be an apples to apples and oranges to oranges calculation. Combining the mixture of results to say it overall is good is not accurate." Mr. Rivera then asked whether Cascade will "be able to make corrections" or "fix the products issue to be able to pass the test?" and stated that "[t]he Program Office and Contracting Officer have let you know that it's a LAT Failure because the results of the test." (App. supp. R4, tab C-33 at CDI 000609-610)

66. By email dated July 11, 2019, Mr. Davis responded to Mr. Rivera, stating that Cascade still had confidence in its filter, and was "convinced that the mandatory retest called for under Section E-3.b.ee.i of the contract will show passing results." Mr. Davis proposed that "[t]o provide the most rigorous test of the filters," Cascade "drop test all 16 filters prior to the lab testing," and that "in future LAT testing, Cascade "continue drop testing of all filters included in the LAT." Mr. Davis stated that Cascade was "ready to re-submit a sample set of filters for LAT testing as soon as you have approved our plan." (App. supp. R4, tab C-34)

67. By email dated July 18, 2019, Mr. Davis again contacted Mr. Rivera, restating the information set forth in his July 11, 2019, email, and stating, "I'm following up on the email I sent you on the 11th – I wanted to see if you had time to read through, and give us approval to get these new filters out for testing. As I see it the Army doesn't have much to lose by approving a retest – and much to gain (as do we). Let me know will you?" (App. supp. R4, tab C-35)

68. By email dated July 24, 2019, Mr. Rivera responded to Mr. Davis's two earlier emails, setting forth his understanding of various contract provisions as to when additional testing is required (app. supp. R4, tab C-36). Mr. Rivera did not address Cascade's suggestion that it subject all 16 filters to drop resistance testing prior to biological testing (*id*.).

69. By email dated July 25, 2019, Mr. Davis responded to Mr. Rivera's July 24, 2019, email, setting forth his understanding of various contract sections as to when additional testing is required, and stating that Cascade is "in compliance with the contract

because we have been working with the Army team to determine the retest protocol" and was waiting on the government's response (app. supp. R4, tab C-37).

*Correspondence Between DCMA and Cascade*

70. By email dated July 24, 2019, to Adam Barnum, Corporate QA Supervisor for Cascade, Mr. Ramos stated:

> Unless you have written guidance that supersedes the Contract W911QY-17-D-0246 you are still required to submit to me a copy of the FACAR for the most current failed Patrol Inline Filter. This is in accordance with Contract W911QY-17-D-0246, Section E-2, paragraphs A., F., L., M., P., and S. A great amount of time (more than 10 working days) have elapsed since the known failure so please submit a copy of your FACAR to me no later than close of business today.

(R4, tab 62 at 3-4)

71. Mr. Barnum responded to Mr. Ramos by email dated July 25, 2019, stating, "[w]e are in compliance with the contract because we have been working with the Army team to determine the retest protocol. Our proposal has been to drop all 16 items and retest and we are waiting on their response." (R4, tab 62 at 3)

*Additional Internal Government Emails Regarding Cascade*

72. Ms. Stapps commented on Mr. Barnum's July 25, 2019, email to Mr. Ramos, stating in an internal government email to Mr. Rivera:

> I would think by now MSR would know to ask for direction on contract meaning instead if their continued misinterpretation. Please forward to Angel the email you sent to MSR that they have failed drop test and we require a FACAR. In multiple locations it states a FACAR is required upon any failure within 10 days. We have told them this repeatedly in the past. I believe I have it in an emails to them.
>
> This is absurd and really out of hand at this point. They need to comply with DCMA ASAP. Slapping someone across the face with silk gloves is still slapping them across the face.

(R4, tab 62 at 2)

73.  In an internal government email dated July 25, 2019 (11:08 pm), Mr. Ramos stated that he would be writing Cascade a Level-2 Corrective Action Report.  Mr. Ramos stated also, "[m]y boss has been briefed on the MSR's behavior to circumvent the contract language.  At this point, MSR is not asking for help instead they are complaining and bullying the system to see is [sic] we bend over backwards in their favor.  In my opinion, MSR is broken beyond repair.  This company cannot be reasoned with. They just don't get it."  (R4, tab 62 at 1-2)

74.  By email dated July 25, 2019 (11:27 pm), to Mr. Ramos, Ms. Stapps stated "[t]hank you Angel.  I am sorry for their behavior, especially given all the upfront assistance you gave them to get them started.  We support any actions you feel are necessary.  Let me know if you need anything."  (R4, tab 62 at 1)

*Level II Corrective Action Request*

75.  By email dated July 26, 2019, to Mr. Barnum, Mr. Ramos stated that he will be issuing a Level-II Corrective Action Request (CAR) for not adhering to contractual requirements (R4, tab 68 at 7).  By letter dated July 30, 2019, Mr. Ramos issued a CAR, describing Cascade's non-compliance as:

> Repeated issue. Cascade Designs Inc. failed to conduct failure analysis and provide a FACAR to PM SCIE, Contracting Officer, and cognizant DCMA within (10) ten working days of notice of failure. In the event of a failure during a FAT or LAT the Government will withhold any or all potentially affected production items from acceptance, and the Contractor shall prepare and submit a Failure Analysis and Corrective Action Report in accordance with Sec. E-2, para. p and Sec. E-3, para iii and ee-i.

(R4, tab 63 at 3)  Mr. Ramos stated that a response to the CAR "must be received by close of business August 9, 2019" (*id.* at 4).

76.  On August 6, 2019, Mr. Barnum responded to DCMA's CAR, stating, "CDI is not retesting until verification from the Government that the retesting protocol is agreed upon and all data will be considered" (R4, tab 64 at 4).

77.  By email dated August 12, 2019, Mr. Ramos responded to Mr. Barnum's August 6, 2019, CAR response, stating "I need a few facts answered to ensure that we are all on the same sheet of music before I can validate the CAP" (R4, tab 66 at 2).  By email dated August 13, 2019, Mr. Ramos revised his August 12, 2019, email, stating that Cascade's CAP "has been rejected for contractual and factual content," effective August 12, 2019, and set a due date of August 22, 2019, for submission of Cascade's next

CAP (R4, tab 66 at 1). Mr. Ramos also provided to Mr. Davis a Memorandum rejecting Cascade's CAP and detailing questions posed by Mr. Ramos (R4, tab 67). One of those questions stated: "[i]t was quoted; 'that the contract does not describe or infer what constitutes a failure that requires a FACAR.' Are the parameters/values not identified? And if not, why was a post-award not accomplished by your team to ensure contract language legitimacy before the start of the program?" (*Id.*)

78. On August 21, 2019, Mr. Barnum submitted Cascade's reply, containing responses to the questions posed by Mr. Ramos in his August 12, 2019, email (app. supp. R4, tab C-41 (reference is to document contained in appellant's Rule 4 supplement dated February 16, 2021)). Mr. Barnum answered Mr. Ramos's above-quoted question, stating:

> That appears to be a miss-quote. Nowhere did we imply, or mean to imply, that the contract does not describe or infer what constitutes a failure but that section E-2.p itself and inclusively does not describe or infer what constitutes a failure. Section E-3.dd.ii is where the contract does describe what constitutes a failure for a P248 test. As to your question "And if not, why was a post-award not accomplished by your team to ensure contract language legitimacy before the start of the program?" we have repeatedly addressed these languages failures to the government, both the program office, and the contracting office. Both have acknowledged that this contract is flawed, signed at the end of the fiscal year, on a weekend, and in a rush, and both have proposed modifications to correct the failures. However, the Program Office chose not to revise the contract.

(*Id*. at CDI-000620)

79. By email dated August 23, 2019, Mr. Ramos informed Mr. Barnum that Cascade's latest CAP "has been rejected for contractual, factual, and mitigation plan content" (R4, tab 68 at 2-3).

80. On September 1, 2019, Mr. Barnum submitted a "corrected CAR with updated CAP" (R4, tab 66 at 2). That document stated:

> 1. The contract states when unfavorable laboratory results occur during a FAT or LAT test the first step is to re-sample the lot and retest. If the retest fails then a FACAR is required within 10 days of failure notification (Section E-3,ee.i). The military group and the DMCA read into the contract that a FACAR was required for laboratory results before retesting.

25

This disparity of the reading of the contract was not brought up until well after the 10 days required from when the laboratory results were submitted. Since the disparity has yet to be resolved, it appeared that CDI was out of compliance with the contract.

....

3. CDI is currently in discussion as to the requirement for a FACAR, as is related to the last lot test laboratory results, as being necessary. If during the discussion all parties agree that a FACAR was indeed required then CDI will submit a FACAR.

(R4, tab 68 at 10)  The document subsequently was signed by Mr. Barnum on September 3, 2019 (*id*. at 1, 10).

*Cure Notice*

81.  On September 4, 2019, the government issued Cascade a Cure Notice, in the form of a Memorandum For Record, stating:

This Cure Notice is to notify you (Cascade Designs Inc.) that the Government considers your refusal to conduct a root cause analysis and provide the FACAR to PM SCIE, the Contracting Officer, and cognizant DCMA within (10) ten working days IAW Section E-3z in contract W911QY-17-D-0246, is a condition that has been endangering performance of this contract. Therefore, unless this condition is cured by 18 September 2019, the Government may terminate for default under the terms and conditions of FAR 52.249-8, contained within this contract.

(JSUMF ¶¶ 168-169; R4, tab 69 at 2)

82.  By letter dated September 17, 2019, Mr. Davis addressed the government's September 4, 2019, Memorandum For Record, stating:

As you know, Cascade Designs and the Army have been unable to resolve their disagreement concerning the correct interpretation of the contractual method for testing of the required Individual Water Treatment Devices ("IWTD" or "Filters") as well as the proper analysis of the testing results

26

with regard to passing and failing. We request the opportunity to meet with you at your earliest convenience to reach an agreement on a final path forward so that we may deliver the IWTD in accordance with the contractual requirements.

. . . .

It is Cascade Design's reasonable interpretation and understanding of these Contract provisions and references that all of the sample pairs from all of the IWTDs sent through the test are to be combined into a single set of data points from which up to 10% of the sample pairs may be below the allowable limits.

. . . .

Cascade Designs is currently awaiting the Army's response with regard to its proposal to perform the drop test on all 16 Filters so that this matter can be resolved. Because a failure has not actually been determined under a reasonable interpretation of the contract terms, the issuance of a FACAR and then a CAR for failure to submit at FACAR is premature. Instead of working with us on the retest, the government instead issued a CAR to us for not submitting the FACAR within 10 days. But since a failure cannot be determined until a retest has confirmed a failure, a FACAR cannot reasonably be prepared and submitted.

Cascade Designs has manufactured Filters that comply with a reasonable interpretation of the contract requirements. Cascade Designs is more than willing to work with the Army to manufacture IWTD that not only meet the requirements of the Contract but are also safe for use by our military personnel. Creating devices that pass the LAT test 100% of the time is not possible due to the known limitation of the biological protocol. Even if greatly enhanced devices were created, some percentage of the tests would show low results due to test variation unrelated to the device performance such as lab contamination. Hence the requirement to be able to apply the 10% rule to all LAT tests.

(R4, tab 74 at 1, 3, 5-6)

27

83. In response to the Cure Notice, on September 18, 2019, appellant submitted a FACAR dated September 13, 2019 (R4, tabs 73, 75). Under the heading "Root Cause," Cascade stated, "[n]o physical cause of this result was found and testing of filter A31720 showed a greater than 4 log reduction of MS2 & fr. Testing of the affected fiber batch also showed a 4 log viral removal. Test variation at the microbiology testing laboratory is the cause of this result." (R4, tab 73 at 3) Under the heading "Root Cause Correction," Cascade stated, "Implement Drop Testing for all 16 sampled filters so that the proper statistical allowance for testing variation can be implemented in future LAT's" (*id*.).

84. By Memorandum to ACC-APG Natick, dated September 23, 2019, LTC Jonathan Allen, Logistics, Product Manager, SCIE, rejected appellant's FACAR submission, "as insufficient evidence of laboratory error," stating that "no direct cause has been conclusively identified in determining why device F, serial number A31720, did not meet the required 4 log reduction of bacteriophage MS-2," and that "[a]bsent a root cause, Cascade Designs did not integrated [sic] a corrective action to mitigate future failure occurrences." The government also rejected all IWTDs manufactured between restart of production in December 2018, "to current day." (R4, tab 77 (digitally signed by Jeffrey Myhre for LTC Allen on September 27, 2019); app. supp. R4, tab C-16) Although the document referenced NSF P248 and the PSTP, it made no mention of the issues raised by Cascade regarding the 10 percent Acceptable Reduction Deviation (*id*.).

85. By email dated October 11, 2019, Stephen Caravalho, Contract Specialist, provided Mr. Davis with a copy of a "response from the Program Office to the Cure Notice" (presumably the September 23, 2019, Memorandum) noting that the document "needed to go through our legal department, SBA, and be discussed with the contracting team on how to move forward" (app. supp. R4, tab C-17 at CDI 000093). In response to Mr. Caravalho's email, Mr. Davis emailed Mr. Oriard internally, stating:

> Not necessarily surprising, but devastating nonetheless. I guess Ronda's motto is "when in doubt, go nuclear". She simply ignores the most expeditious path toward getting the Army a filter, and blows everything up. (Note, Doug has been saying for some time now that the Army doesn't want our filter - I think this letter supports that contention!).

(*Id*.)

86. By letter dated October 22, 2019, 11 days after the government notified appellant of the FACAR rejection, the contracting officer terminated the contract for default pursuant to FAR 52.249-8, finding that Cascade's "failure to perform is not excusable." As support for his decision, the contracting officer stated:

28

> You were notified of the LAT Failure on 07 June 2019; you
> were provided a Level II CAR on 25 July 2019; you were
> provided a Memorandum for Record rejecting the CAP
> pertaining to the Level II CAR on 13 August 2019; and
> notified through a Cure Notice that your failure to conduct an
> analysis and provide a FACAR endangered the performance
> of the contract on 04 September 2019.

(R4, tab 79)  Although the termination letter references several documents provided to appellant by the government, it does not mention the contractor's submission of a FACAR, or the sufficiency of that FACAR for purposes of satisfying the Cure Notice (*id*.).  The letter also makes no mention of the contractor's request for clarification regarding the 10 percent Acceptable Reduction Deviation (*id*.).

87.  A copy of the October 22, 2019, termination for default, was provided to Cascade by email dated November 1, 2019 (R4, tab 81).  Cascade acknowledge receipt of the termination for default letter via email dated November 2, 2019 (R4, tab 82).

88.  On January 27, 2020, Cascade submitted to the Board a Notice of appeal and complaint.  On January 31, 2020, the Board issued a notice of docketing, designating the appeal as ASBCA No. 62378.

DECISION

## I. *Standard of Review*

"Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003).  "The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).  A party challenging a motion for summary judgment "'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank or Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).  It does not matter that the parties have cross-moved for summary judgment, both claiming that there exists no material issue of fact. *Osborne Constr. Co.*, ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,513 ("[e]ach cross-motion is evaluated separately on its merits, and all reasonable inferences are drawn in favor of the defending party; the Board is not bound to 'grant judgment as a matter of law for one side or the other'" (quoting *Mingus Constructors*, 812 F.2d at 1391)).

29

## II. *Appellant's Challenge to the Government's Termination for Default is a Government Claim*

A termination for default is a government claim. *Securiforce Int'l America, LLC v. United States*, 879 F.3d 1354, 1363 (Fed. Cir. 2018). "The government bears the burden of proof in establishing the validity of a default termination." *Johnson Mgmt. Grp. CFC, Inc. v. Martinez*, 308 F.3d 1245, 1249 (Fed. Cir. 2002). "[A] default-termination is a drastic sanction . . . which should be imposed (or sustained) only for good grounds and on solid evidence." *J.D. Hedin Constr. Co. v. United States*, 187 Ct. Cl. 45, 57, 408 F.2d 424, 431 (1969). Where the government satisfies its burden of establishing the validity of the default termination, the contractor has the burden of establishing that the default was excusable. *Highland Al Hujaz Co., LTD*, ASBCA No. 58243, 16-1 BCA ¶ 36,336 at 177,164, *aff'd*,696 Fed. Appx. 509 (2017) (per curiam). The contractor meets its burden if it can demonstrate that "the government materially breached the contract thereby discharging appellant's duty to perform," that its failure to perform was well beyond its "control and without its fault or negligence or that of its subcontractors or suppliers," or that the contracting officer's "default decision was arbitrary or capricious or an abuse of discretion." *Id*. (citations omitted).

## III. *Contentions of the Parties*

A central issue that permeates the factual and legal arguments raised by the parties in their respective motions is the import and application of the contract's Acceptable Reduction Deviation, as applied to the drop resistance test. Both parties argue that their motions present issues of contract interpretation, appropriate for resolution on motion for summary judgment. The government argues that "[t]he entirety of this appeal rests on the terms of the contract containing the various testing protocols" (gov't mot. at 1). According to the government, "[a]ppellant refused to follow unambiguous Lot Acceptance Test procedures" (gov't resp. at 2). Appellant argues that "[t]he principal issue in this case is the Army's refusal to recognize the 'Acceptable Reduction Deviation' Contract provision applicable to microbiological testing performed on IWTDs tested for 'Drop Resistance' that is in the Contract's test procedures written by the Army" (app. mot. at 1).

It is undisputed that the contract included an Acceptable Reduction Deviation applicable to quality assurance procedures, required by the QATIP when conducting a LAT. Specifically, PSTP Section 5.6 states that, in accordance with NSF P248, while conducting a LAT, the IWTPs "must continuously meet or exceed the log reduction requirements shown in Table 3, except for the following acceptable allowance," - "[u]p to 10% of influent/effluent sample pairs may vary from the reductions required in Table 5 by: Viruses: 1 log [and] Bacteria: 1 log." (SOF ¶ 6) The parties agree that "[d]uring the LAT, the PSTP requires that the water purifiers continuously meet or exceed the reduction requirements and only permits up to 10% of samples to deviate from the

30

requirement within a range of 1 log for viruses and 1 log for bacteria" (*id*.). The parties diverge, however, in their application of the 10 percent Acceptable Reduction Deviation when considered in the context of the drop resistance test.

## IV. *Contract Ambiguity and the Intent of the Parties*

As an administrative tribunal, our primary purpose when resolving questions of contract interpretation is "to ascertain the intention of the contracting parties . . . ." *Southbridge Assocs., LLC*, ASBCA No. 54628, 05-1 BCA ¶32,855 at 162,799 (citing *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988)). "Contract interpretation begins with the plain language of the agreement." *Foley Co. v. United States*, 11 F.3d 1032, 1034 (1993). "[T]he language of a contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 388, 351 F.2d 972, 975 (1965). Generally, matters of contract interpretation are often well-suited for summary judgment where the contract contains no ambiguity which must be resolved through extrinsic evidence. *Walsh Group Ventures*, ASBCA No. 61222, 20-1 BCA ¶ 37,615 at 182,584.

During contract performance, the government took the position that the QATIP drop resistance test, which calls for testing six sample points, presented an insufficient number of sample points to allow application of the Acceptable Reduction Deviation (SOF ¶¶ 29, 39, 47, 57). This is because 10 percent of the six samples is less than one sample (.6) and, therefore, if one samples fail, it exceeds the 10 percent Acceptable Reduction Deviation (SOF ¶¶ 29, 39). As noted by appellant, the government's "interpretation means that the 3 filters that passed the drop resistance test must pass the biological testing without any Acceptable Reduction Deviation set forth in Section 5.6 of the Purifier Specific Test Plan because the use of just 3 filters does not allow for a 10% variance, i.e., 10% of 6 tests is 6/10ths" (app. mot. at 13). The consequence of government's interpretation is that, although the contract allows for a deviation when analyzing LAT results for the drop resistance test, by virtue of the limited number of samples, the deviation is rendered inapplicable, requiring instead a 100 percent pass rate for the drop resistance test (SOF ¶ 82).

Appellant argues that the government's "requirement for a 100% pass rate is not supported by the language of the Contract when read as a whole but rather is an interpretation made up after the fact to support a new test criteria that the Army wanted to impose on Appellant" (app. reply at 10). During contract performance, appellant noted that "[c]reating devices that pass the LAT test 100% of the time is not possible due to the known limitation of the biological protocol" (SOF ¶ 82). As support, appellant cited documents evidencing the historical derivation of the Acceptable Reduction Deviation, as well as its development prior to award, up through inclusion of the provision in the contract (SOF ¶¶ 6, 12, 46).

Appellant argues that the government's contract interpretation fails to give "affect to all terms of the Contract" and renders meaningless "the Acceptable Reduction Deviation contract provision . . . when applied to the 3 filters that were drop resistance tested" (app. mot. at 20). When read in isolation, the 10 percent Acceptable Reduction Deviation provision and the LAT drop resistance test provision, appear unambiguous. However, when read together they create an ambiguity, such that, although the contract specifies a 10 percent Acceptable Reduction Deviation applicable to the LAT drop resistance test, the number of samples points specified for the drop resistance test renders the Acceptable Reduction Deviation inoperative and, in essence, superfluous. Because of this apparent anomaly, the government spent a good deal of the contract performance period trying to decide whether to remove the 10 percent Acceptable Reduction Deviation from the contract. (SOF ¶¶ 26, 29, 31, 34, 37, 39-41, 47, 54)

It is well established that "an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (quoting *Arizona v. United States*, 216 Ct. Cl. 221, 235-36, 575 F.2d 855, 863 (1978)). Under these circumstances, it is appropriate for this tribunal to consider extrinsic evidence to aid in our resolution of issue presented. *The Haskell Co.*, ASBCA No. 61711, 20-1 BCA ¶ 37,676 at 182,901 (contrary provisions in a contract "create an ambiguity that cannot be resolved without examining extrinsic evidence to aid the Board in its interpretation"); *Columbia State Bank (Formerly Appeal of Castle-Rose, Inc.)*, ASBCA No. 59531, 16-1 BCA ¶ 36,399 at 177,454 ("Because contradictory provisions exist requiring examination of extrinsic evidence to determine the parties' intentions, granting of summary judgment is not appropriate."). "When the meaning of a contract and the parties' intentions are both relevant and in dispute, there are mixed questions of fact and law that pose triable issues precluding summary judgment." *Tkacz Eng'g, LLC*, ASBCA No. 60358, 18-1 BCA ¶ 36,940 at 179,962-63 (citations omitted). Extrinsic evidence may include "evidence regarding discussions and concurrent actions, the prior course of dealing between the parties, or custom and trade usage." *Gen. Dynamics – Nat'l Steel and Shipbuilding Co.*, ASBCA No. 61524, 19-1 BCA ¶ 37,291 at 181,417 (citation omitted).

The record suggests that after award, both parties recognized the ten percent Acceptable Reduction Deviation was problematic, when considered in conjunction with the LAT protocol (SOF ¶¶ 29, 31, 34, 37, 39-41, 47, 54, 78). The record contains emails from various government employees stating their belief that the government erroneously included the 10 percent Acceptable Reduction Deviation as part of the QATIP drop resistance LAT protocol (SOF ¶¶ 54, 57- 58). For example, both the SCIE quality assurance representative, Ms. Stapps, and the Army Contracting Command contract specialist, Mr. Rivera, took the position that the 10 percent Acceptable Reduction

Deviation erroneously was included in the LAT protocol as some type of "cut and paste error" (SOF ¶¶ 54, 58).[7] Dr. Vindman, the SCIE Project Officer, also felt that the 10 percent Acceptable Reduction Deviation "was errantly included" (SOF ¶ 29).

In contrast, however, are statements attributed to Mr. Dunn, SCIE's lead project engineer, to the effect that the wording of the 10 percent Acceptable Reduction Deviation "was exactly his intent" when he "wrote it as the primary engineer" (SOF ¶¶ 32-33). These statements by Mr. Dunn, who helped develop the LAT protocol, seem at odds with the positions taken by Ms. Stapps, Mr. Rivera, and Dr. Vindman during contract performance that the Acceptable Reduction Deviation was included in error.

In addition, several documents authored by appellant question the likelihood of such a "cut and paste error" occurring given the considerable number of discussions and reviews that took place in preparing the LAT protocol (SOF ¶¶ 46, 59-60). Indeed, appellant informed the government on numerous occasions that, if the term was included in the contract in error, the parties needed to come to an agreement as to revised lot acceptance testing requirements (SOF ¶¶ 48, 50, 53, 56, 66-67, 69, 71, 76, 78, 82).

As discussed above, the government spent several months discussing possible removal of the 10 percent Acceptable Reduction Deviation from the LAT protocol, and, for a period of time, stated that it had removed the Acceptable Reduction Deviation from the contract, although the parties could not agree upon new language that would allow for its application in some other manner (SOF ¶¶ 29, 31, 34, 37, 39-41, 47, 49- 54). Ultimately, both Ms. Stapps and Mr. Rivera took the position that, because the parties could not agree on new protocol, the government "will revert to the original contract." (SOF ¶ 54, 58, *see* ¶ 53). Both stated that the government was not required to interpret the 10 percent Acceptable Reduction Deviation: "[d]ue to the nature of the error, it is beyond the Government's scope to define or clarify, that which was never intended to be part of the abbreviated protocol" (SOF ¶¶ 54-58).

---

[7] In its responsive brief, the government states that "[a]ppellant references, without citation, a communication from the contracting officer, in which he stated that the inclusion of the Acceptable Reduction Deviation language in the LAT was a 'cut and paste error'" (gov't resp. at 5 (citing app. mot. at 22)). The government then argues that, "reading the entire communication from the contracting officer shows that the Army recognized that this language was the language adopted by the parties, and the Army would hold appellant to that standard" (gov't resp. at 5 (citing JSUMF ¶ 135)). The government attributes this document to the contracting officer, citing JSUMF ¶ 135, however, the quotation is taken from an attachment to Mr. Rivera's, April 29, 2019, email (SOF ¶ 58 (see R4, tab 55 at 2-3)).

The government's position begs the question: how can the government "revert to the original contract" when the government takes the position that the Acceptable Reduction Deviation testing protocol was included in error? Yet, when the parties could not agree upon revised LAT protocols for the drop resistance test, the government imposed its own interpretation of Acceptable Reduction Deviation (thereby defining or clarifying the contract to its own advantage), which rendered the 10 percent Acceptable Reduction Deviation inapplicable to the drop resistance test and instead required the LAT IWTDs pass the drop resistance test 100 percent of the time (SOF ¶¶ 54-58).

The record includes documents suggesting that Cascade relied upon the 10 percent Acceptable Reduction Deviation as one of the factors it considered in preparing its cost estimate (SOF ¶ 30). The record also includes documents suggesting that Cascade did not agree with the government's characterization of the 10 percent Acceptable Reduction Deviation as a cut and paste error, given the parties exchange of information regarding the LAT protocol during contract formation (SOF ¶¶ 46, 59-60). Whether the 10 percent Acceptable Reduction Deviation was a cut and paste error, or a purposeful inclusion in the contract, and the implications of any such determination, presents a material issue of fact. To resolve this issue, we must look to extrinsic evidence to help ascertain the parties' intent, something we are unable to consider on motions for summary judgment.[8]

### V. *Cascade's Response to the Cure Notice and the Government's Termination for Default*

"The Government has the burden of proving that the work which it rejected did not conform to the contract requirements." *Nat'l Molded Prods.*, ASBCA No. 45780, 96-1 BCA ¶ 28,043 at 140,022 (citing *Southwest Welding & Manufacturing Co. v. United States*, 188 Ct. Cl. 925, 955, 413 F.2d 1167, 1185 (1969)). The government terminated the contract pursuant to FAR 52.249-8, after issuing to appellant a Cure Notice in the form of a Memorandum For Record dated September 4, 2019 (SOF ¶¶ 81, 86). FAR 52.249-8(a)(1)(ii) grants the government the right to terminate a contract for default if the contractor fails to make progress, so as to endanger performance of the contract. 48 C.F.R. § 52.249-8. That right "may be exercised if the Contractor does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure" (*id.*).

---

[8] Appellant argues that assuming the government's "interpretation of the Contract is reasonable, the Contract contains a latent ambiguity that must be construed against the Army as the author" (app. mot. at 26). The government counters that appellant's "latent ambiguity argument fails because of appellant's prior conduct and prior contract interpretation" (gov't resp. at 8). Because we first must resolve the factual issue of whether extrinsic evidence establishes the parties' intent, we do not address here the issue of whether any ambiguity is patent or latent.

The Cure Notice here stated that appellant's "refusal to conduct a root cause analysis and provide the FACAR" was a condition endangering performance of the contract and that the government may terminate the contract for default pursuant to FAR 52.249-8, unless the condition was cured by September 18, 2019 (SOF ¶ 81).  By letter dated September 17, 2019, Cascade addressed the government's September 4, 2019, Memorandum Of Record containing the Cure Notice, stating that the parties had "been unable to resolve their disagreement concerning the correct interpretation of the contractual method for testing of the . . . [IWTDs] as well as the proper analysis of the testing results with regard to passing and failing," that "Cascade Designs is currently awaiting the Army's response with regard to its proposal to perform the drop resistance test on all 16 Filters so that this matter can be resolved," and that "[b]ecause a failure has not actually been determined under a reasonable interpretation of the contract terms, the issuance of a FACAR and then a CAR for failure to submit at FACAR is premature" (SOF ¶ 82).

Although Cascade's September 17th letter raised several objections to the appropriateness of the government issuing Cure Notice (SOF ¶ 82), on September 18, 2019, appellant *submitted* a FACAR in response to the Cure Notice (SOF ¶ 83).  The FACAR included information discussing both "Root Cause," and "Root Cause Correction" (SOF ¶ 83).  Specifically, for "Root Cause," Cascade stated that "[n]o physical cause of this result was found and testing of filter A31720 showed a greater than 4 log reduction of MS2 & fr," that "[t]esting of the affected fiber batch also showed a 4 log viral removal," and that "[t]est variation at the microbiology testing laboratory is the cause of this result."  (SOF ¶ 83)  For "Root Cause Correction," Cascade stated, "[i]mplement Drop Testing for all 16 sampled filters so that the proper statistical allowance for testing variation can be implemented in future LAT's" (SOF ¶ 83).

The government challenges the sufficiency of appellant's FACAR, detailing alleged deficiencies in the report, and arguing that the government "was clearly justified in terminating for default" (gov't mot. at 30-31).  In its reply brief, the government states "[t]he question before the Board upon which this entire case hinges is whether the Army's refusal to adopt appellant's proposed contract change excused appellant from submitting a FACAR as directed by the contracting officer" (gov't reply at 13).  The government rejected Cascade's FACAR "as insufficient evidence of laboratory error" because "no direct cause has been conclusively identified in determining why device F, serial number A31720, did not meet the required 4 log reduction of bacteriophage MS-2," and absent a root cause, Cascade did not integrate "a corrective action to mitigate future failure occurrences."  (SOF ¶ 84)  The government's rejection of Cascade's FACAR did not mention the issues raised by Cascade in its September 17th letter regarding application of the Acceptable Reduction Deviation (*id*.).

In its motion for summary judgment, appellant challenges the propriety of the government's default termination based upon appellant's alleged refusal to complete a

35

FACAR (app. resp. at 3-5). Appellant states "[t]he documented record is that appellant did conduct a FACAR with the result being that no root cause failure of Filter F could be identified, i.e., no manufacturing defect, no fiber defect, no failure to meet virus reduction requirements," and that appellant "reasonably concluded that '[t]est variation at the microbiology testing laboratory is the cause of this result'" (app. resp. at 5). Appellant likewise challenges the sufficiency of the government's response to the FACAR, stating that the government, "without explanation or justification simply rejected the FACAR's finding that no correctable cause was found for the 'failure' of Filter F-a filter that subsequently passed 3 additional water purification tests and that had not suffered any damage as part of the drop resistance test" (app. mot. at 28; see also app. reply at 7-8).

Whether termination of the contract for default was proper based upon the deficiencies identified by the government in the Cure Notice raises material issues of fact and requires us to make findings regarding the sufficiency of appellant's FACAR – findings we are unable to make on motions for summary judgment. This especially is true given that the current FACAR/Cure Notice dispute, and the subsequent default termination, appear intertwined with LAT testing protocols underpinning the government's determination, which the government claims were erroneously included in the contract and appellant claims were erroneously applied by the government.

The government likewise argues that "[a]ppellant cannot deny that it refused to perform for 147 days" (gov't reply at 15). Contrary to the government's assertion, appellant does in fact deny the government's allegation that appellant "did not perform for over 100 days," citing documents in the record that dispute the government's allegation (app. resp. at 3 n.1). The sufficiency of appellant's response, and the documents cited, raise a disputed issue of material fact that we simply cannot resolve at this stage of the litigation.

We have considered the parties' remaining arguments in favor of summary judgment and are not persuaded by them.

CONCLUSION

The motions are denied.

Dated: February 16, 2022

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62378, Appeal of Cascade Designs, Inc., rendered in conformance with the Board's Charter.

Dated: February 17, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals